IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA
SOUTHWESTERN DIVISION

| | | |
|---|---|---|
| The National Bank of Harvey, | ) | |
| | ) | **ORDER DENYING DEFENDANTS'** |
| Plaintiff, | ) | **MOTION TO DISMISS AND** |
| | ) | **GRANTING DEFENDANTS'** |
| vs. | ) | **MOTION TO TRANSFER** |
| | ) | |
| Bathgate Capital Partners, LLC and Steven Signer, | ) | Case No. 1:06-cv-053 |
| | ) | |
| Defendants. | ) | |

Before the Court is the Defendants' "Joint Motion to Dismiss or to Transfer Venue," filed on January 31, 2007. For the reasons outlined below, the motion to transfer is granted.

I.   **BACKGROUND**

This matter arises out of what is essentially a purported contract dispute. The plaintiff, National Bank of Harvey, is a nationally chartered bank doing business in Harvey, North Dakota. See Affidavit of Gary Bergstrom, ¶ 1 (Docket No. 19-2). Gary Bergstrom is the president of the National Bank of Harvey. Defendant Bathgate Capital Partners is a Colorado limited liability company with its main offices located in Greenwood Village, Colorado. See Exhibit A, Affidavit of Richard Huebner, ¶ 1 (Docket No. 17-4). Bathgate Capital Partners is engaged in business as a securities broker-dealer. Defendant Steven Signer is a Colorado resident who has been employed as a securities account representative at Bathgate Capital Partners since January 2003. See Exhibit B, Affidavit of Steven Signer, ¶ 1 (Docket No. 17-5). Signer works at Bathgate Capital Partners' branch office in downtown Denver, Colorado. Until October 7, 2004, Bathgate Capital Partners'

1

customer accounts were cleared[1] by Fiserv Securities, Inc., later known as NF Clearing, Inc. ("Fiserv"), which was located in Pennsylvania. See Exhibit A, Affidavit of Richard Huebner, ¶ 2. After October 7, 2005, Bathgate Capital Partners' customer accounts were cleared by First Southwest Company ("First Southwest")located in Texas.

In October 2004, the Bathgate Capital Partners arranged for the opening of a securities margin account at Fiserv for a new customer, the Hubman Foundation ("Fiserv Account No. XXXX8027").[2] See Exhibit B, Affidavit of Steven Signer, ¶ 4 (Docket No. 17-5). The Hubman Foundation is a nonprofit Kansas corporation with its main offices in Wichita, Kansas. Its president, Timothy Hubman, is also a Kansas resident. In October 2004, Tim Hubman contacted Bergstrom requesting a loan of $4 million to be used by the Hubman Foundation to open an investment account with Bathgate Capital. See Affidavit of Gary Bergstrom, ¶ 2 (Docket No. 19-2).

On or about December 6, 2004, Signer and Hubman signed a letter addressed to Signer regarding "Securities Account Control Instructions" (the "Account Instructions"). See Exhibit B, Affidavit of Steven Signer, ¶ 5 and Appendix 1 (Docket No. 17-5). The Account Instructions stated:

> Hubman Foundation has opened account #XXXX8027 with your firm. We intend to fund this account with a $4,000,000.00 loan from The National Bank of Harvey, plus $120,000.00 of our own funds. It is our desire that you comply strictly with the following instructions regarding the trading of the account:
> 1.  Account shall only be used for the purchase and sale, either long or short, of US Treasury notes and bonds.

---

[1] Bathgate Capital Partners refers to caselaw to define the role of clearing firms:
Clearing firms . . . relieve brokerage firms . . . of the huge costs associated with "back office operations. . . . [B]rokerage firms . . . contract with clearing firms, who, for a fee, will meet certain record-keeping and other regulatory requirements for the brokerage firm. . . . [T]he clearing firm handles the "mechanical, record-keeping functions related to the clearance and settlement of various transactions" in the account of the introducing firm's customers.
Dillon v. Millitano, 731 F. Supp. 634, 636 (S.D. N.Y. 1990).

[2] All account numbers have been redacted in accordance with Section XV(A) of the Administrative Policy Governing Electronic Filing and Service.

  2. Account must maintain principle balance at $4,001,000.00 or higher.
  3. We direct that you not disburse any funds to any party that would reduce the principle balance of the account below the initial deposit of $4,120,000.00.
  4. In the event the account principle balance falls to $4,001,000.00 on an overnight basis, we direct that you immediately liquidate the account and forward all remaining funds to The National Bank of Harvey.
  5. We, as well as The National Bank of Harvey, wish to be notified immediately in the event that there is any lien placed on the account, beyond any lien created on the treasury bonds held in the margin in the account.
  6. You acknowledge that, at this time, there is no lien or restriction on the account, other than the security interest in the account granted to The National Bank of Harvey.
  7. You will not waiver from these instructions without prior written direction from both The National Bank of Harvey and Hubman Foundation.

 It is our desire that these instructions be specifically complied with in the trading and management of the account. Please acknowledge you understanding and agreement with the above by signing below and returning one original to us as well as one original to The National Bank of Harvey.

See Exhibit B, Affidavit of Steven Signer, ¶ 5 and Appendix 1 (Docket No. 17-5). The Account Instructions were signed by Hubman in Kansas and by Signer in Colorado. Id.

On December 8, 2004, in compliance with Hubman's instructions, Singer sent the National Bank of Harvey an e-mail providing background information about Fiserv Account No. XXXX8027. The e-mail provided:

 Tim Hubman asked me to send you wire coordinates for his account with Bathgate Capital.

 Those coordinates are as follows:

 JP Morgan Chase
 ABA #XXXXX0021
 Account of Fiserv Securities, Inc. Main Operations
 Account #XXXXX1524
  Further Credit to: Hubman Foundation
   Account #XXXX8027

> Fiserv Securities holds all funds and securities for our customers. They handle all clearing operations. Their account has recently been moved to JP Morgan Chase – New York.
>
> Please let me know if you need further information.

See Exhibit B, Affidavit of Steven Signer, ¶ 5 and Appendix 2 (Docket No. 17-5).

On January 12, 2005, the National Bank of Harvey's president, Gary Bergstrom, attended a meeting in Denver regarding Fiserv Account No. XXXX8027. See Exhibit B, Affidavit of Steven Signer, ¶ 5 (Docket No. 17-5).

On June 3, 2005, Signer called the National Bank of Harvey and told Bergstrom that the account had dropped below $4 million. See Exhibit B, Affidavit of Steven Signer, ¶ 6. This telephone conversation was recorded by Signer. Id. at ¶ 6 and Appendix 3.

On or about October 7, 2005, Bathgate Capital Partners changed clearing firms from Fiserv to First Southwest. See Exhibit A, Affidavit of Richard Huebner, ¶ 2 (Docket No. 17-4). As part of this change, Fiserv Account No. XXXX8027 was closed and its holdings were transferred to First Southwest. Id. First Southwest opened a new account for the Hubman Foundation with the account number XXXX6842. Id.

On November 2, 2005, Bergstrom traveled from North Dakota for another meeting with Signer in Colorado. See Exhibit B, Affidavit of Steven Signer, ¶ 8 (Docket No. 17-5). Hubman did not attend this meeting. Id. After the meeting, Bergstrom sent Signer an e-mail requesting several changes to the First Southwest Account No. XXXX6842.

> As a followup to our meeting in Denver, we need to accomplish the following per our discussions:
> 1. List account as Hubman Foundation/National Bank so we can have access to periodic account information, status, balances, account access codes, etc.

> 2. Get us the revised information due to the switch from Fiserv to Fidelity. This would be the account number as well as safekeeping and clearing information of the account.
> 3. Authorization for both Tim Hubman and Steve Bergstrom[3] on the account.
> 4. Agree that all distributions will be made to the Hubman account at the National Bank of Harvey.
> 5. I would like to also go over the statement of customers positions with you so I correctly understand the information.

See Exhibit B, Affidavit of Steven Signer, Appendix 5 (Docket No. 17-5). Signer believed, based on his understanding of industry regulations and clearing firm requirements, that these changes to First Southwest Account No. XXX6842 could not be made without Hubman's written permission. See Exhibit B, Affidavit of Steven Signer, ¶ 9 (Docket No. 17-5).

As of December 21, 2005, Hubman had not yet authorized in writing the changes that the National Bank of Harvey had requested. Id. at ¶ 10. On December 21, 2005, the National Bank of Harvey sent Signer a fax demanding that the account be liquidated. Id. Signer believed, based on his understanding of industry regulations and clearing firm requirements, that no liquidation could occur without first obtaining Hubman's written permission. Signer responded to the National Bank of Harvey via a fax. See Exhibit 16 (Docket No. 19-19).

On December 28, 2005, in a conversarion that Signer tape recorded, Signer called Bergstrom to tell him that Hubman had authorized the liquidation, but that the account was again below $4 million. See Exhibit B, Affidavit of Steven Signer,¶ 10 and Appendix 6 (Docket No. 17-5).

Beginning in January 2006 and continuing through March 2006, Gary Bergstrom contacted Bathgate Capital and Singer on a continuous basis in an attempt to obtain the remainder of the funds in the Hubman Foundation account with Bathgate Capital.

---

[3] Steve Bergstrom is the brother of Gary Bergstrom and a Washington state resident. See Exhibit B, Affidavit of Steven Signer, ¶ 9 (Docket No. 17-5).

On or about January 20, 2006, and pursuant to Hubman's written authorization, $1,200,000 was wired from First Southwest Account No. XXXX6842 to the National Bank of Harvey. Id. ¶ 11.

On or about May 11, 2006, and again pursuant to Hubman's written authorization, an additional $1,710,000 was wired to the National Bank of Harvey. Id. These wire transfers, like all other wires out of the Hubman Foundation's accounts, were sent by the clearing firm's bank and not by the Defendants. Id.; Exhibit C, Affidavit of Susan Ross, ¶ 4 (Docket No. 17-6).

On or about May 25, 2006, the National Bank of Harvey filed a complaint in Burleigh County District Court against Bathgate Capital Partners and Signer seeking to recover $1,090,000 still owed to the National Bank of Harvey. The Defendants contend that the Hubman Foundation is the party who is responsible for the debt. On June 27, 2006, the Defendants removed the case to federal court.

On January 31, 2007, the Defendants filed a "Joint Motion to Dismiss or to Transfer Venue," asserting that the claim should be dismissed for lack of personal jurisdiction or, alternatively, the case should be transferred to the District of Colorado. The National Bank of Harvey filed a response on March 2, 2007.

## II.   LEGAL DISCUSSION

### A.   PERSONAL JURISDICTION

"To defeat a motion to dismiss for lack of personal jurisdiction, the nonmoving party need only make a prima facie showing of jurisdiction." Epps v. Stewart Information Services Corp., 327 F.3d 642, 647 (8th Cir. 2003) (citing Falkirk Min. Co. v. Japan Steel Works, Ltd., 906 F.2d 369, 373 (8th Cir. 1990); Watlow Elec. Mfg. v. Patch Rubber Co., 838 F.2d 999, 1000 (8th Cir. 1988)). "The

plaintiff's prima facie showing must be tested, not by the pleadings alone, but by the affidavits and exhibits presented with the motions and in opposition thereto." Dever v. Hentzen Coatings, Inc., 380 F.3d 1070, 1072 (8th Cir. 2004). The party seeking to establish the court's in personam jurisdiction carries the burden of proof, and the burden does not shift to the party challenging jurisdiction. Epps, 327 F.3d 642, 647 (citations omitted).

As a preliminary matter, it should be noted that this action is in federal court based on diversity jurisdiction. See 28 U.S.C. § 1332(a). Under Rule 4(k)(1)(A) of the Federal Rules of Civil Procedure, a federal district court in a diversity action will have personal jurisdiction to the same extent as a state court of the state in which that federal district court sits. Dean v. Oibas, 129 F.3d 1001, 1003 (8th Cir. 1997). Therefore, when a federal court sits in diversity, the analysis for personal jurisdiction involves two steps: (1) the court must determine whether the State of North Dakota would accept jurisdiction under the facts of this case; and (2) the court must determine whether the exercise of jurisdiction comports with constitutional due process restrictions. Lakin v. Prudential Securities, Inc., 348 F.3d 704, 706-707 (8th Cir. 2003) (citing Sondergard v. Miles, Inc., 985 F.2d 1389, 1392 (8th Cir. 1993)). To satisfy the first step of the jurisdictional analysis, the Court will address the relevant North Dakota provisions governing personal jurisdiction over non-resident defendants.

The jurisdiction of North Dakota courts is governed by the North Dakota long-arm statute set forth in Rule 4(b)(2) of the North Dakota Rules of Civil Procedure. The North Dakota Supreme Court has held that Rule 4(b)(2) "authorizes North Dakota courts to exercise jurisdiction over nonresident defendants to the fullest extent permitted by due process . . . ." Hansen v. Scott, 645 N.W.2d 223, 230 (N.D. 2003) (citing Auction Effertz, Ltd. v. Schecher, 611 N.W.2d 173 (N.D.

7

2000); Hust v. Northern Log, Inc., 297 N.W.2d 429, 431 (N.D. 1980)).  The Eighth Circuit has held that when a state construes its long-arm statute to grant jurisdiction to the fullest extent permitted by the Constitution, the two-step test collapses into a single question of whether the exercise of personal jurisdiction comports with due process.  Johnson v. Woodcock, 444 F.3d 953, 955 (8th Cir. 2006); Oriental Trading Co, Inc. v. Firetti, 236 F.3d 938, 943 (8th Cir. 2001); Bell Paper Box, Inc. v. U.S. Kids, Inc., 22 F.3d 816, 818 (8th Cir. 1994); see Hansen v. Scott, 645 N.W.2d 223, 232 (N.D. 2002) (recognizing that a federal court sitting in diversity may collapse the two-step framework under North Dakota law).

"Due process requires minimum contacts between [a] non-resident defendant and the forum state such that maintenance of the suit does not offend traditional notions of fair play and substantial justice."  Dever v. Hentzen Coatings, Inc., 380 F.3d 1070, 1073 (8th Cir. 2004) (citing Burlington Indus., Inc. v. Maples Indus., Inc., 97 F.3d 1100, 1102 (8th Cir. 1996); World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 291-92 (1980)).  There are two categories of minimum contacts with a state that may subject a defendant to jurisdiction in that forum, i.e., general and specific. With respect to general jurisdiction over a defendant, "a court may hear a lawsuit against a defendant who has 'continuous and systematic' contacts with the forum state, even if the injuries at issue in the lawsuit did not arise out of the defendant's activities directed at the forum."  Dever, 380 F.3d 1070, 1073 (quoting Helicopteros Nacionales de Colombia, S.A. v. Hall, 466 U.S. 408, 415-16 (1984)).  A state has specific jurisdiction over a defendant when the suit arises out of, or is related to, the defendant's contacts with the forum state.

Both categories of minimum contacts require some act by which the defendant purposely avails himself or herself of the privilege of conducting activities within the forum state, and thus

invokes the benefits and protections of its laws. If a court determines that a defendant has minimum contacts with the forum state, the court must then consider "'whether the assertion of personal jurisdiction would comport with fair play and substantial justice.'" Id. (quoting Burger King Corp. v. Rudzewicz, 471 U.S. 462, 476 (1985)).

The Eighth Circuit has established a five-part test for measuring minimum contacts for purposes of asserting personal jurisdiction over a defendant: (1) the nature and quality of a defendant's contacts with a forum state; (2) the quantity of such contacts; (3) the relation of the cause of action to the contacts; (4) the interest of the forum state in providing a forum for its residents; and (5) the convenience of the parties. Dever, 380 F.3d 1070, 1073-74 (citing Burlington Indus., Inc. v. Maples Indus., Inc., 97 F.3d 1100, 1102 (8th Cir. 1996)). In determining whether a defendant has sufficient contacts with the forum state to exercise personal jurisdiction, the court must consider all of the contacts in the aggregate and examine the totality of the circumstances. Northrup King Co. v. Compania Productora Semillas Algodoneras, S.A., 51 F.3d 1383, 1388 (8th Cir. 1995). The Eighth Circuit affords "significant weight" to the first three factors.

The Defendants contend that the Court does not have general jurisdiction over them. The National Bank of Harvey acknowledges in its brief that it is not seeking a determination that the Court has general jurisdiction over the Defendants. Rather, the parties focus on the issue of whether the Court has specific jurisdiction over the Defendants.

As previously noted, specific jurisdiction requires that the cause of action arise out of or be related to the defendants' contacts with the forum state. Epps v. Stewart Information Services Corp., 327 F.3d 642, 648 (8th Cir. 2003). The Court will analyze each of the Defendants' contacts in relation to the claims being asserted and the factors prescribed by the Eighth Circuit.

9

      **1.**      **NATURE AND QUALITY OF CONTACTS**

Under this factor, the primary issue is whether the non-resident defendants "have fair warning that a particular activity may subject a person to the jurisdiction of a foreign sovereignty." Gould v. P.T. Krakatau Steel, 957 F.2d 573, 576 (8th Cir. 1993) (citing Shaffer v. Heitner, 433 U.S. 186, 204 (1977)). The fair warning requirement will be satisfied if the defendant has "purposefully directed" his or her activities at the residents of the forum state. Id. (citing Burger King Corp. v. Rudzewicz, 471 U.S. 462, 472 (1985)). The contact(s) with the forum state must be more than "random, fortuitous, or attenuated." Id. The contact(s) must not be the result of "unilateral activity of another party or a third person." Id.

The Defendants assert that the nature and quality of their contacts with North Dakota do not support a finding of specific jurisdiction. The Defendants note that the Account Instructions which form the basis for many of the National Bank of Harvey's claims were executed in Kansas and Colorado – not in North Dakota. See Exhibit B, Affidavit of Steven Signer, ¶ 5 (Docket No. 17-5). The owner of the account that was the subject of the Account Instructions was the Hubman Foundation which is based in Kansas. Id. ¶ 4. The Hubman Foundation's president, Timothy Hubman, was also a resident of Kansas. Id. The decision to obtain a loan from the National Bank of Harvey was made solely by the Hubman Foundation. Id. The Defendants never traveled to North Dakota for any meetings or for any other purpose. See Exhibit B, Affidavit of Steven Signer, ¶ 12 (Docket No. 17-5). The Defendants contend that they did not subject themselves to the jurisdiction of North Dakota courts simply because one of their customers chose to borrow from a North Dakota bank.

The National Bank of Harvey argues that the Defendants "purposefully directed" their activities to North Dakota because the National Bank of Harvey was either a party to the Account Instructions or that it was a third-party beneficiary of the Account Instructions. The National Bank of Harvey asserts that the Defendants entered into a contract with it, and through the performance of the contract, acknowledged that it was the real party in interest to the agreement.

As to the National Bank of Harvey's assertion that it was a party to the Account Instructions, the record is devoid of evidence to support this assertion. The Account Instructions were signed by Timothy Hubman as President of the Hubman Foundation and by Steven Signer, as Director of Fixed Income for Bathgate Capital Partners. See Exhibit B, Affidavit of Steven Signer, Appendix 1 (Docket No. 17-5). It is well-established that "the mention of one's name in an agreement, in itself, does not give rise to a right to sue for the enforcement of the agreement." Russel v. Bank of Kirkwood Plaza, 386 N.W.2d 892, 895 (N.D. 1986).

As an alternate argument, the National Bank of Harvey argues that it was a third-party beneficiary to the Account Instructions. Even if the Court were to assume that the National Bank of Harvey was a third-party beneficiary, this still does not subject the Defendants to personal jurisdiction in North Dakota. In Moog World Trade Corp. v. Bancomer, S.A., 90 F.3d 1382 (8th Cir. 1996), Moog World Trade Corp., a Missouri corporation, agreed to sell auto parts to a customer in Mexico, CRG. To finance the purchase, CRG contracted with its Mexican bank, Bancomer, to issue a letter of credit naming Moog World Trade Corp. as beneficiary. When Moog World Trade Corp.'s draw under the letter of credit was dishonored, it sued Bancomer. The district court dismissed Bancomer for lack of personal jurisdiction and the Eighth Circuit affirmed:

> When Bancomer issued its letter of credit, it did not *make* a contract with Moog, it *performed* a contract with its Mexican customer, CRG. The identify and location of

11

> CRG's beneficiary was of little if any concern to Bancomer, because it looked to CRG for both its letter of credit fee and reimbursement of any payment Bancomer might make under the credit. True, the letter of credit created a separate, conditional obligation running from Bacomer to Moog as beneficiary. But that bare letter of credit obligation, while contractual in nature, was not the making of a contract with Moog. Nor was it the transacting of business in Missouri . . . . Moreover, relying upon traditional due process principles, other federal courts have been virtually unanimous in holding that a bank issuing a commercial letter of credit at the request of its customer, payable at the bank's offices, does not without more subject itself to personal jurisdiction in a distant forum, such as a court where the letter of credit beneficiary resides.

Moog World Trade Corp. v. Bancomer, S.A., 90 F.3d 1382 ,1386 (8th Cir. 1996) (emphasis in original).

Similar to the contacts between Bancomer and Moog World Trade Corp, when the Defendants corresponded with the National Bank of Harvey, they were performing their contract with the Hubman Foundation. But for the Hubman Foundation's choice to obtain a loan from the National Bank of Harvey, it is unlikely the Defendants would have had any contact with the National Bank of Harvey. Even if the terms of the Account Instructions were drafted by the National Bank of Harvey as an attempt to protect its security interest and subsequently included in the agreement between the Hubman Foundation and the Defendants, such actions do not constitute an action taken by the Defendants which would subject them to personal jurisdiction in North Dakota. As a result, the nature and quality of the Defendants' contacts with North Dakota does not support an exercise of personal jurisdiction.

## 2. QUANTITY OF CONTACTS

It is well-established that specific jurisdiction can arise from a single contact with the forum state. Fulton v. Chicago, Rock Island & P.R. Co., 481 F.2d 326, 334-36 (8th Cir. 1973). However, when specific jurisdiction is being alleged the quantity of contacts is not determinative. West Publishing Co. v. Stanley, No. Civ. 03-5832 (JRT/FLN), 2004 WL 73590, *4 (D.Minn. Jan. 7, 2004); (citing Marquette Nat'l Bank of Minneapolis v. Norris, 270 N.W.2d 290, 295 (Minn. 1978); McGee v. Int'l Life Ins. Col., 355 U.S. 220, 223 (1957); Marshall v. Inn of Madeline Island, 610 N.W.2d 670, 674 (Minn. Ct. App. 2000)). Thus, the Court is not concerned with the number of contacts made for purposes of whether specific jurisdiction exists.

The Defendants contend that their only contacts with North Dakota include sixteen telephone calls, ten faxes, five e-mails and one letter. See Exhibit E, Affidavit of Steven Plissey, ¶ 6 and Appendix 7 (Docket No. 17-2). The National Bank of Harvey does not dispute the list of contacts compiled by the Defendants, but instead, relies upon its assertion that the National Bank of Harvey was a party to the Account Instructions.

The Eighth Circuit Court of Appeals has held that "contact by phone or mail is insufficient to justify exercise of personal jurisdiction under the due process clause." Porter v. Berall, 293 F.3d 1073, 1076 (8th Cir. 2002) (citing T.J. Raney & Sons, Inc. v. Sec. Sav. & Loan Assoc., 749 F.2d 523, 525 (8th Cir. 1984)); Digi-Tel Holdings, Inc. v. Proteq Telecommunications (PTE), Ltd., 89 F.3d 519, 523 (8th Cir. 1996) (holding that although defendant "sent numerous letters and faxes and made several telephone calls to Minnesota," "these contacts do not create a 'substantial connection' to Minnesota").

It is undisputed that all of the contacts by the Defendants with the National Bank of Harvey were via either telephone or mail. Moreover, the Court is not concerned with the number of contacts made for purposes of whether specific jurisdiction exists. See West Publishing Co. v. Stanley, No. Civ. 03-5832 (JRT/FLN), 2004 WL 73590, *4 (D.Minn. Jan. 7, 2004); (citing Marquette Nat'l Bank of Minneapolis v. Norris, 270 N.W.2d 290, 295 (Minn. 1978); McGee v. Int'l Life Ins. Col., 355 U.S. 220, 223 (1957); Marshall v. Inn of Madeline Island, 610 N.W.2d 670, 674 (Minn. Ct. App. 2000)). As a result, the quantity of the Defendants' contacts with North Dakota does not support an exercise of personal jurisdiction.

### 3.     RELATION OF CONTACTS TO CAUSE OF ACTION

The Defendants contend that none of the National Bank of Harvey's causes of action arise out of the North Dakota contacts detailed above. The National Bank of Harvey's first claim is a breach of contract claim based on the Account Instructions. The second claim is base on an oral contract allegedly made by the Defendants during a November 2, 2005, meeting in Denver. The third claim is for negligence based on the Account Instructions. The fourth claim is for fraud based in part upon fraudulent concealment, in that the Defendant suppressed the fact that by failing to advise the National Bank of Harvey that the account balance had fallen below the minimum, as outlined in the Account Instructions. The fifth claim is for constructive fraud based on the Account Instructions. The National Bank of Harvey again relies on its assertion that it is a party to the Account Instructions.

As previously discussed, the Court has found that there is no evidence to support the National Bank of Harvey's assertion that it was a party to the Account Instructions. It is undisputed

that the execution of the Account Instructions took place outside of North Dakota by non-residents. The National Bank of Harvey's claim of breach of an oral contract is based on activity occurring exclusively in the state of Colorado. The final three causes of action all arise out of the Account Instructions.

It does not appear that the Defendants' contact with North Dakota (i.e., the sixteen telephone calls, ten faxes, five e-mails and one letter) were the sole basis for any of the alleged claims. Nevertheless, at least some of the Defendants' contacts with North Dakota were in relation to the National Bank of Harvey's claims (i.e., the December 6, 2005, e-mail response from Steve Signer to Gary Bergstrom regarding the follow-up to the Denver meeting (Docket No. 17-5, Appendix 5) and the December 21, 2005, fax from Steven Signer to Gary Bergstrom regarding liquidation of the funds (Docket No. 19-19, Exhibit 16). Although it is a close call, the Court finds that at least some of the Defendants' contacts with North Dakota were in relation to the cause of action. As a result, the Court finds this factors weighs in favor of the exercise of personal jurisdiction.

### 4. INTEREST OF THE FORUM STATE

It is well-established in the Eighth Circuit that the first three factors as outlined above are of "primary importance," and the last two factors are of "secondary importance." Stanton v. St. Jude Medical, Inc., 340 F.3d 690, 694 (8th Cir. 2003); Northrup King Co. v. Compania Productora Semillas Algodoneras, 51 F.3d 1383, 1388 (8th Cir. 1995); Aaron Ferer & Sons Co. v. American Compressed Steel Co., 564 F.2d 1206, 1210 n.5 (8th Cir. 1977). The interest of the forum state is the fourth factor to be considered for purposes of exercising personal jurisdiction.

It stands to reason that North Dakota has an interest in adjudicating these claims and providing a forum for its residents.  See Aylward v. Fleet Bank, 122 F.3d 616, 618 (8th Cir. 1997) (quickly dispensing with this part of the test by assuming the forum state has an interest in providing a forum for its residents).  However, this fact becomes even less important if instead of granting a dismissal, the Court were to transfer venue to Colorado where the National Bank of Harvey would have a full opportunity to litigate its claims.  See Drayton Enterprises, LLC v. Dunker, 142 F. Supp. 2d 1177, 1186 (D. N.D. 2001).  Nevertheless, the Court finds that the fourth factor weighs in favor of the exercise of personal jurisdiction.

### 5.     CONVENIENCE OF THE PARTIES

Finally, the Defendants contend that the convenience of the parties weighs against an exercise of personal jurisdiction in North Dakota.  The Defendants argue that only one of the named witnesses resides in North Dakota.  The National Bank of Harvey contends that both parties will be inconvenienced regardless of where the trial is held.

The Eighth Circuit has recognized that a plaintiff is normally entitled to choose the forum in which to litigate a case.  Northrup King Co. v. Compania Productora Semillas Algodoneras, 51 F.3d 1383, 1389 (8th Cir. 1995).  The Court understands that the majority of the fact witnesses are located outside the state of North Dakota.  The Court finds that this factor does not favor either party.

Based on the Defendants' minimal contacts with North Dakota and the totality of the circumstances, the Court finds that exercising jurisdiction over the Defendants would violate due process.  See Northwest Airlines, Inc. v. Astraea Aviation Services, Inc., 111 F.3d 1386, 1390 (8th

Cir. 1997). The exercise of personal jurisdiction based on the totality of circumstances presented would offend traditional notions of fair play and substantial justice. As a result, the Court find it lacks personal jurisdiction over the Defendants.

### B.       TRANSFER

Upon finding a lack of personal jurisdiction, the Court is free to either dismiss the case pursuant to Rule 12(b)(2) of the Federal Rules of Civil Procedure or transfer the case to the District of Colorado pursuant to 28 U.S.C. § 1631. See Lopez v. Heinauer, 332 F.3d 507, 511(8th Cir. 2003) (a federal court has power to transfer to the proper federal court a case in which the court lacks jurisdiction, provided that the case would have been timely filed has it been filed in the proper court in the first instance). Section 1631 provides, as follows:

> Whenever a civil action is filed in a court . . . and that court finds that there is a want of jurisdiction, the court shall, if it is in the interest of justice, transfer such action . . . to any other court in which the action . . . could have been brought at the time it was filed or noticed, . . . .

The Court must consider three factors when considering a motion to transfer a civil action to another district: (1) the convenience of the parties; (2) the convenience of the witnesses; and (3) the interests of justice. See 28 U.S.C. § 1404(a). Motions for a change of venue are evaluated on a case-by-base basis following an examination of all relevant factors. Terra Int'l, Inc. v. Mississippi Chem. Corp., 119 F.3d 688, 691 (8th Cir. 1997).

### 1.       CONVENIENCE OF THE PARTIES

The Defendants contend that the convenience of the parties favors venue in Colorado because one of the defendants, Steve Signer, is an individual who is defending plaintiff's claims out

17

of his own pocket and who lacks the resources of the corporate parties. The National Bank of Harvey contends that both parties will be inconvenienced regardless of where the trial is held. As discussed in the Court's personal jurisdiction analysis, the Court finds that this factor does not favor either party.

### 2.     CONVENIENCE OF THE WITNESSES

The Defendants argue that only one of the named witnesses, Gary Bergstrom, the president of the National Bank of Harvey, resides in North Dakota, while, in contrast, five of the named witnesses reside in Colorado. The Defendants further argue that Bergstrom willingly traveled to Denver for two meetings with Signer. Finally, the Defendants argue that the remaining anticipated witnesses all reside outside of both North Dakota and Colorado, and therefore the convenience of those witnesses is neutral because testimony in either venue would require travel.

The National Bank of Harvey argues that there are only three pertinent witnesses in this case, Bergstrom, the bank president and a resident of North Dakota, Steve Singer, a resident of Colorado, and Tim Hubman, a resident of Kansas. The National Bank of Harvey contends that, regardless of the venue, one side will be more inconvenienced than the other.

Although the National Bank of Harvey believes that all of the Defendants' witnesses may not be necessary, the Court recognizes that the majority of the fact witnesses are either located in Colorado or are located outside the state of North Dakota. The Court finds that this factor weighs in favor of venue in Colorado.

### 3.     INTERESTS OF JUSTICE

In Terra International Inc. v. Mississippi Chemical Corp., 119 F.3d 688, 696 (8th Cir. 1997), the Eighth Circuit recognized several sub-factors to review in evaluating the interests of justice: (1) judicial economy; (2) plaintiff's choice of forum; (3) comparative costs to the parties of litigating in each forum; (4) each party's ability to enforce a judgment; (5) obstacles to a fair trial; (6) conflict of law issues; and (7) the advantages of having a local court determine questions of local law.

The Defendants argue that the only factor that favors a North Dakota venue is the Plaintiff's choice of forum, and that the remaining factors either favor a transfer to Colorado or are neutral in their effect. The Defendants contend that the comparative costs of litigating in each forum favors Colorado because, if this case proceeds in North Dakota, two parties must pay for local counsel and travel whereas only one party bears such expenses if the case proceeds in Colorado.

The Defendants also contend that the ability of each party to enforce a judgment favors a Colorado venue because the National Bank of Harvey is the only party seeking damages and it would be less expensive for it to enforce a money judgment issued in Colorado because that is where both Defendants reside and there would be no need for any recognition of judgment proceedings. The Court finds that this factor favors a Colorado venue.

Finally, the Defendants contend that the advantages of having a local court determine questions of local law favors a Colorado venue because the contract issues in this case are likely to be decided under Colorado law since the alleged contracts were entered into in whole or in part in the state of Colorado. The National Bank of Harvey argues that a North Dakota court should have no problem understanding Colorado's contract law. The Court finds that Colorado courts are more familiar with Colorado law governing contracts and that this factor weighs in favor of a Colorado

venue.  Further, both parties agree, at least as an alternative position, that the interests of justice favor a transfer of the case to the District of Colorado.  The Court finds that the interests of justice warrant a transfer to the District of Colorado.

In summary, the Court finds that the convenience of the witnesses and the interests of justice favor a transfer to the District of Colorado, and that the convenience of the parties is a neutral factor in evaluating whether a transfer is appropriate.  A transfer of this action to Colorado is warranted and appropriate under the circumstances.

### III.	CONCLUSION

Based on the foregoing, the Defendant's Motion to Dismiss or Transfer Venue is **GRANTED** in part and **DENIED** in part.  (Docket No. 15).  The Motion to Dismiss is **DENIED** and the Motion to Transfer to the United States District Court for the District of Colorado is **GRANTED**.  The Clerk of Court is directed to transfer the case to the United States District Court for the District of Colorado.

**IT IS SO ORDERED.**

Dated this 4th day of April, 2007.

*/s/ Daniel L. Hovland*
Daniel L. Hovland, Chief Judge
United States District Court